UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

ATLANTIC MUTUAL INSURANCE COMPANIES,

        Plaintiffs,

       v.                            Case No. 03-C-41

BRIAN and KAARE LOTZ,

        Defendants/Counter-Plaintiffs,

       v.

ATLANTIC MUTUAL INSURANCE COMPANIES,

        Counter-Defendants.
_____

O R D E R

On January 15, 2003, Atlantic Mutual Insurance Companies ("Atlantic Mutual") filed a complaint against Brian and Kaare Lotz (the "Lotzs") seeking a declaration that the insurance policy it issued to the Lotzs does not cover widespread mold and rot damage discovered in their home. The Lotzs have filed a counterclaim against Atlantic Mutual alleging breach of contract, breach of implied covenant and bad faith conduct.

Atlantic has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c) on the grounds there is no coverage for the loss, there was no breach of contract, and there was no breach of implied covenant or bad faith conduct. The Lotzs

have moved for partial summary judgment on the limited ground that the losses

to their home constituted occurrences within the policy period. The motions are

fully briefed and the court now addresses them.

F A C T U A L   B A C K G R O U N D

This case is very fact intensive. The following is only a summary of the

relevant facts in the light most favorable to the non-movants. On April 29, 2002,

the Lotzs purchased a two-level single family home in the Village of Whitefish

Bay, Wisconsin. The home was constructed in the 1920s with a significant

addition added in 1991. The original structure consisted of an entryway, a living

room, a dining room, a kitchen, two bedrooms, and a main bathroom. It appears

the only portions of the original structure that suffered mold and rot damage were

the entryway, the kitchen, and the main bathroom. The 1991 addition included

the eating area, family room, half-bath, and laundry room on the first floor, and

the master bedroom and bath on the second floor. It appears each room suffered

rot and mold damage to some degree.

Before the Lotzs purchased the home, they had it inspected by U.S. Inspect.

U.S. Inspect issued a report citing several problems, none of which caused the

Lotzs to back out of the purchase. Among the deficiencies noted in the report

were that the brick walkway sloped toward the home and created a situation

where water might flow toward the structure, the stone veneer on the exterior of

the home was deteriorating and perhaps permitting water to seep through it, the bathroom vented to the attic rather than outside, and some of the flashing on the roof had slipped away. The report also noted that no drain was provided for the pressure release valve connected to the steam shower in the master bathroom.

The Lotzs insured the home under a policy issued by Atlantic Mutual for the period May 3, 2002, to May 3, 2003. On May 21, 2002, Brian Lotz used the steam shower in the master bath and noticed afterward water spots on the walls and ceilings in the areas below. Lotzs had Michael Hackett, President of Building & Design Specialists, look into the matter. Hackett concluded the water spotting resulted from a long-term leak caused by improper installation of the steam shower. He noted the steam shower lacked a tile flange or pan liner to redirect water leaking through openings in the caulking, and he noted the walls around the shower were constructed of drywall rather than cement board. Finally, he noted the pressure release valve did not have a drain to prevent released water from splashing on the floor. Hackett concluded the entire steam shower needed to be replaced to stop the leak.

Atlantic Mutual received notice of the steam shower incident on June 3, 2002, and Joel Hossli, an adjustor for Atlantic Mutual, had Matt Everett of Paul Davis Restoration look into the matter. After inspecting the bathroom on June 4, 2002, Everett concluded the steam shower had been leaking over a period

-3-

of time. He arrived at this conclusion after observing multiple dry, circular, orange colored water stains on the walls and ceilings below the shower as well as on the timbers in the basement. He also concluded the steam shower was poorly constructed because it lacked a tile flange and a drain for the pressure release valve.

On June 13, 2002, Brian Lotz hired John Melvan of Inspection and Assessment Services to determine whether he had a mold problem, and if so, the extent of it. Melvan concluded there was mold in the home, and he recommended the following areas be remediated: (1) drywall and wall coverings on the north and east walls in the half-bath, (2) a sizable portion of the kitchen ceiling, (3) a portion of the north wall in the master bathroom and a small portion of the east wall, and (4) a portion of the west wall and the flooring in the main bathroom. Melvan also concluded it was apparent the home had been subjected to water seepage for some time.

On June 19, 2002, U.S. Inspect inspected the home a second time and issue a second report. The second report noted water staining in the areas below the steam shower. The report highlighted the presence of relatively fresh paint on the stained areas and concluded the presence of this paint indicated the previous owners were aware of the water leakage and tried to conceal it before they sold the home.

Case 2:03-cv-00041-JPS   Filed 08/24/05   Page 4 of 38   Document 150

Aspen Restoration performed the remediation recommended by Melvan. During the course of the remediation, mold was discovered in other areas of the home. Specifically, mold was discovered in other areas of the kitchen ceiling, almost the entire bathroom sub-floor, part of the sub-floor in the master bedroom, and the attic. Aspen remediated these areas as well. In the course of removing the steam shower, Aspen noticed there was no pan liner or tile flange underneath. Aspen guessed part of the mold in the sub-floor of the bathroom and master bedroom was due to leaking from the hydronic tubing in the floor used to heat that area of the home.

In mid-July, the Lotzs hired Stewarts Custom Cabinetry to remodel portions of the home. According to the building permit issued by the Village of Whitefish Bay, the scope of the remodeling was rather limited, but by early August, the remodeling project spanned nearly every room in the 1991 addition as well as the roof. In the course of remodeling, Stewarts found additional mold and rot. Specifically, mold and rot was found in the remainder of the floor in the master bedroom, the remainder of the ceiling in the kitchen and walls, the ceiling and floor in the half-bath and main bath, and the walls and floor of the family room. The remodeling project also disclosed several potential sources of water intrusion that led to the mold and rot: (1) rain water infiltration from windows in the

-5-

master bathroom, master bedroom, and family room; (2) leakage from the steam shower as well as the toilet and shower in the main bath; (3) lack of proper flashing on portions of the roof; (4) leakage from the hydronic tubing in the floors of the 1991 addition as well as the floors in the kitchen; (5) infiltration of water at the base of the family room walls; (6) water seepage through the stone veneer; and (6) moisture accumulation from the vent into the attic.

Soon after Stewarts started uncovering mold and rot, its owner, Scott Stewart, contacted Joel Jaster, the building inspector for the Village of Whitefish Bay. Stewart wanted Jaster to take note of the sub-par work previously performed on the home (he did not want to be responsible for someone else's shoddy workmanship) as well as the widespread presence of mold and rot. Jaster visited the home on several occasions, and on September 12, 2002, he issued a letter to the Lotzs stating pursuant to public nuisance ordinances, the home had to be vacated until the mold was remediated.

On October 28, 2002, Jaster sent another letter to the Lotzs indicating nothing had been done to remediate the home. The letter stated the Village of Whitefish Bay was giving the Lotzs two additional weeks to remediate the home. After Brian Lotz received the letter, he called Jaster and told him he was not going to do any remediation work. Because the Lotzs decided not to repair or remediate

-6-

the home, the Village of Whitefish Bay issued an order to demolish it. A raze order was issued November 19, 2002, and the home was demolished on December 12, 2002. After the demolition, Atlantic paid $19,608.77 to the Lotzs for what it deemed to be the damage resulting from the one-time shower leak in May 2002. The payment was made to replace the shower and toilet in the master bathroom, remediate the mold caused by the one-time leak, and to replace the wood rotted as a result of the leak.

Prior to the demolition, Atlantic Mutual had Henry Uhlig of Entek Environmental & Technological Services, Inc. ("Entek") visit the home and report on the potential causes of the mold and rot. Uhlig concluded the rot he observed would have taken more than a year to develop, and he concluded much of the water intrusion which led to the mold and rot resulted from construction defects which included the following: (1) improperly constructed front entry porch; (2) lack of counterflashing at the wall/roof intersections of the front entryway; (3) missing hip/ridge singles on the roof; (4) lack of vent openings on roof of eating area; (5) construction of base of family room below exterior grade; (6) lack of flashing to redirect moisture and water from unprotected framing of family room; (7) lack of flashing at wall/slab intersection of family room; (8) lack of weep

-7-

holes in lower course near the stone veneer and concrete foundation of the family room; (9) visible gaps in the caulk at the perimeter of the windows and doors.

The Lotzs hired their own expert, Lindsay Anderson, to visit the home prior to its demolition and opine as to the possible causes of the water seepage and moisture that led to the mold and rot. He reported 12 separate causes: (1) excess moisture from the clothes dryer and bathroom exhausts venting into the attic; (2) water leaking from the master bathroom steam shower; (3) rain water infiltration through the round window on the east elevation of the master bedroom; (4) rain water infiltration at the intersection of the eating area roof and the east wall of the main bath; (5) water leaking from the toilet in the main bath; (6) water leaking from the shower in the main bath; (7) water leaking from the hydronic heating tubes in the sub-floor of the master bedroom; (8) rain water infiltration through the joints/cracks in the stone veneer on the east, south, and west elevations of the family room; (9) rain water infiltration at the roof flashing above the main entryway; (10) rain water infiltration through the stone veneer at and above the stoop at the front entryway; (11) water infiltration at the base of the west and south exterior walls; and (12) rain water infiltration at the intersection of the roof and the wall of the northwest corner of the 1991 addition.

-8-

## JURISDICTION, VENUE, AND STANDARD OF REVIEW

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391. The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of a factual dispute does not defeat a summary judgment motion; rather, the requirement is that there be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine when the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a summary judgment motion "may not rest upon mere allegations or denials," but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In evaluating a motion for summary judgment, a court is ". . . not required to draw every conceivable inference from the record–only those that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

-9-

### DISCUSSION

The parties' motions require the court to construe the language in the insurance policy. The construction of an insurance policy is generally a matter of law for the court. *Taylor v. Greatway Ins. Co.*, 628 N.W.2d 916, 920 (Wis. 2001). "Insurance policies are construed as they would be understood by a reasonable person in the position of the insured." *American Family Mutual Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). The court does not construe policies to provide coverage for risks the insurer did not contemplate or underwrite, however. *Id.*

At the outset, the court addresses Atlantic Mutual's argument that the Lotzs' claims are barred under the policy because they failed to provide Atlantic Mutual with timely notice of their claims. The policy provides an insured is to notify Atlantic Mutual or its agent "as soon as possible" in the event of an accident or loss. (Policy at 15 of 19.) It appears from the evidence in the record the Lotzs may not have provided Atlantic Mutual with notice of mold and rot damage as soon as possible, and any reasonable jury could so find. As such, the Lotzs bear the burden at trial to demonstrate Atlantic Mutual did not suffer prejudice as a result of the untimely notice:

-10-

> Once lack of notice has been demonstrated, the insured must produce sufficient evidence to satisfy the fact finder by a preponderance of the evidence that no prejudice has been suffered by the insurer as a result of the failure to give such notice.

*Ranes v. Am. Family Mut. Ins. Co.*, 569 N.W.2d 359, 362 (Wis. Ct. App. 1997). Here, the court is obliged to conclude there is a triable issue as to whether Atlantic Mutual was prejudiced by the untimely notice. Therefore, it would be inappropriate to grant summary judgment on this issue.

Atlantic Mutual next argues the policy does not provide an initial grant of coverage for the Lotzs' claims of mold and rot damage. Atlantic contends the claims were not fortuitous, and moreover, did not constitute "occurrence[s]" within the policy period. The court disagrees. The policy at issue in this case is an "all risk" policy, and as such, it pays for losses "caused by a fortuitous and extraneous happening" but not losses that are "almost certain to happen because of the nature or inherent qualities of the property insured." *Glassner v. Detroit Fire & Marine Ins. Co.*, 127 N.W.2d 761, 764 (Wis. 1964). Atlantic Mutual argues the mold and rot damage in the Lotzs' home was not fortuitous because it was in existence at the time the home was insured. The Lotzs argue the damage was fortuitous because it was discovered during the policy period and was unknown to the parties at the time the home was insured. Whether a loss is fortuitous if it

-11-

was physically in existence at the time a property was insured, but unknown to the parties at the time the insurance policy was issued, appears to be an open question in Wisconsin. Most courts, as well as the First Restatement of Contracts, adhere to the view that a loss is fortuitous if neither party knew or contemplated there was a defect in the insured property at the time the insurance contract was issued. *See, e.g., University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1281 (6th Cir. 1995); *Ins. Co. of N. Am. Inc. v. U.S. Gypsum Co., Inc.*, 870 F.2d 148, 151 (4th Cir. 1989); *Morrison Grain Co., Inc. v. Utica Mut. Ins.*, 632 F.2d 424, 430-31 (5th Cir. 1980); *Icarom, PLC v. Howard County, Md.*, 981 F. Supp. 379, 390 (D. Md. 1997); *Underwriters Subscribing to Lloyd's Ins. Cert. No. 80520 v. Magi, Inc.*, 790 F. Supp. 1043, 1048 (E.D. Wash. 1991); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 192 (D. Conn. 1984). This view is both logical and reasonable in light of the relevant authorities. Moreover, the court believes the Wisconsin Supreme Court would adhere to it. After all, if at the time the insurance policy is issued, neither party is aware a property contains defects, the parties are bargaining over the risk that the property is defect-free. Thus, if a defect is ultimately uncovered, the loss is the product of a risk or chance, and it is properly characterized as a fortuitous loss.

Atlantic disagrees and directs the court to *Adams-Arapohoe v. Continental Ins. Co.*, 891 F.2d 772, 775 (10th Cir. 1989), where in the Tenth Circuit read the Wisconsin Supreme Court's decision in *Glassner v. Detroit Fire & Marine Ins. Co.*, 127 N.W.2d 761, 764 (Wis. 1964), for the proposition that a pre-existing loss is certain and inevitable–and therefore not fortuitous–even if it was not known by the parties at the time the policy was issued. The court does not share the Tenth Circuit's expansive view of *Glassner*. In *Glassner*, the Wisconsin Supreme Court never squarely addressed whether the discovery of a pre-existing defect in a property which was unknown to the parties at the time the insurance policy was issued constituted a fortuitous loss (*i.e.*, resulted from a risk as opposed to being an ordinary and almost certain consequence of the condition of the property). Given the clear trend of authority that a pre-existing loss is fortuitous if neither party knew about it at the time the insurance policy issued, the court believes Wisconsin Supreme Court would conclude the losses suffered by the Lotzs were fortuitous.

Atlantic Mutual next contends the Lotzs' claims are not covered under various doctrines akin to the concept of fortuity. Only one warrants brief mention: the loss-in-progress doctrine. The Wisconsin Supreme Court has never adopted the version of the loss-in-progress doctrine which holds that a loss that

-13-

is occurring at the time an insurance policy is issued is not covered regardless of whether the parties are aware of the loss. However, it has suggested if it were to adopt a form of the doctrine, it would adopt the "known loss" doctrine, which requires that at the time the policy was issued, the insured had substantial knowledge that the loss was occurring or had already occurred in order that coverage be precluded. *Am. Girl*, 673 N.W.2d at 85 (applying the known loss doctrine and equating it with the loss-in-progress doctrine). In fact, the cases Atlantic Mutual cites in support of the loss-in-progress doctrine actually adhere to the so-called "known loss" doctrine, which holds a loss in progress is covered so long as the insured did not have substantial knowledge of a loss at the time the policy was issued. *Pittman Co. Ultramar Am., Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 516 (3d Cir. 1997); *CPC Int'l, Inc. v. Aerojet-General Corp.*, 825 F. Supp. 795, 810 (W.D. Mich 1993). Thus, to the extent the loss-in-progress or known loss doctrines impact this case, it is only to the extent the Lotzs knew or should have known about the losses in progress at the time the insurance policy was issued.

Against this backdrop, the court is obliged to conclude there are triable issues concerning the initial grant of coverage. Although there is some evidence in the record to suggest the Lotzs should have had reason to believe there was pre-existing damage to the house or that there was a loss was in progress (*e.g.*, the

-14-

U.S. Inspect report), the finder of fact could certainly conclude neither the Lotzs nor Atlantic Mutual had substantial knowledge that the home contained substantial mold and rot damage or that such damage was occurring as of April 29, 2002. As such, the court is constrained to deny Atlantic Mutual summary judgment on this ground.

Atlantic argues even if the Lotzs' losses were fortuitous, they are not covered because they did not constitute "occurrence[s]" within the policy period. The court does not agree. The policy states, "We'll pay only for occurrences that take place during the policy period." (Policy at 2 of 19) (emphasis omitted). The policy defines "occurrence" an "incident that causes an accident or loss [which] can be a single event or a series of related events." (Policy at 17of 19.) The word "incident," which is not defined by the policy, is commonly defined as a "happening" and "an occurrence of an action or situation that is a separate unit of experience." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 609 (1983). The word "loss," which is also not defined by the policy, is defined in the dictionary as "an instance of losing," and the word "lose," is defined in the dictionary as to "suffer deprivation of" especially in "an unforseen or accidental manner." *Id.* at 706; WEBSTER'S THIRD NEW INT'L DICT. 1338 (1981). The word "suffer" is defined in the dictionary as "to feel keenly" and to "experience,"

-15-

"undergo" and "bear."  WEBSTER'S NINTH at 1179; WEBSTER'S THIRD INT'L. at 2284.  Against this backdrop, the court is obliged to construe the word "occurrence" as a discrete happening which causes a deprivation which is felt or experienced.

Here, the evidence in the record permits an inference that the Lotzs' losses in the form of mold and rot damage were discrete happenings that were felt or experienced during the policy period, and as such, the losses were occurrences within the policy period.  The discrete happenings were discovery of physical damage in the home, and the deprivation was the loss in the value of the home the Lotzs felt and experienced as a consequence.  Thus, in the context of this case, the "incident" would be the discovery of the mold and rot, and the "loss" would be the consequential damage.

This construction not only accords with the plain and ordinary meaning of the words in the policy, it also accords with the reasonable expectations of a person in the shoes of the insured.  Under this construction, an "incident causing [a] loss" refers to the point in time where the insured becomes or reasonably should become aware of damage to his property, which is the only point in time when an insured feels and experiences a deprivation.  In some cases, the discovery of the damage to the property and the damage to the property itself happen at the

-16-

same time (*e.g.*, a tree limb crashes through the living room), but in other cases–especially those where the damage is progressive and gradual (*e.g.*, the circumstances in this case)–the damage is frequently not discovered until long after the damage is done.  In either case, the damage is felt and borne by the insurer only after it becomes appreciable.  Any reasonable lay person who owns property would understand this and would certainly understand the words "incident causing [a] loss" to mean the discovery of the property damage, not the damage itself.

Atlantic disagrees and urges a construction where "incident causing . . . loss" refers to the happening which results in physical damage, not the discovery of the damage.  Thus, in the context of this case, the "incident" would be the water infiltration, leakage, and moisture accumulation, and the "loss" would be the resulting physical damage itself (*i.e.*, the rot, mold).   The court cannot abide this construction because it does not accord with the plain and ordinary meaning of the words used in the policy and it does not appear to accord with the reasonable expectations of an insured.  But Atlantic's construction suffers from an even more basic infirmity: it would lead to an absurd result.  The policy requires an insured to submit a proof of loss claim within "60 days of the loss" or risk a loss of coverage.   Atlantic Mutual has already shown a willingness to deny coverage

-17-

through a strict application of the notice provisions in the policy, and it now seeks to have the court construe the policy in a manner which would effectively require an insured to submit a proof of loss within 60 days of a loss which physically exists but is unknown and could not reasonably be known to the insured. Thus, if the word "loss" meant only physical damage and not the appreciation of the damage, the 60 day notice requirement would be nothing short of absurd because under such circumstances, an insured would never be able to file a timely notice of claim. Finally, it is worth pointing out Atlantic Mutual's insistence that the word "loss" is tantamount to a physical damage finds no support in the language of the policy; indeed, the terms "physical damage" and "loss" are treated as separate terms in the policy. (Policy at 3 of 19) ("We cover your property against *physical damage* or *loss.*"). In light of the foregoing, Atlantic Mutual is not entitled to summary judgment on the ground the Lotzs' losses were not occurrences within the policy period.[1]

Atlantic next argues if there is an initial grant of coverage, coverage for the Lotzs' losses are nonetheless excluded under several provisions in the policy. The court partially agrees. However, before it examines the exclusions, the court

---

[1] The Lotzs' motion for partial summary judgment appears to ask this court to find their losses *were* occurrences within the meaning of the policy. However, there is a triable issue as to whether the losses were occurrences during the policy.

-18-

addresses the Lotzs' argument that Atlantic Mutual is not able to rely on these exclusions due to waiver and estoppel. The Lotzs contend if Atlantic Mutual truly believed these exclusions precluded coverage, it would have said so earlier and certainly would not have paid for rot and mold damage which resulted from the one-time leak from the steam shower in May 2002. Moreover, the Lotzs contend Atlantic Mutual did not properly preserve its rights to rely on these exclusions in its several correspondences with the Lotzs related to this coverage dispute. The court cannot conclude Atlantic Mutual has waived or otherwise lost its right to raise these defenses. An insurer does not forego its right to raise defenses to coverage simply by making a payment on a former claim. *See, e.g., Am. Int'l Specialty Lines v. Canal Indem. Co.*, 352 F.3d 254, 271 (5th Cir. 2003) (insurer does not waive right to asset coverage defenses to subsequent claim when making payment on current claim). If this were so, insurers would be required to engage in lengthy, expensive investigations prior to paying any claim only to avoid "massive exposure down the road." *Charter Oil Co. v. Am. Employers' Ins. Co.*, 69 F.3d 1160, 1168 (D.C. Cir. 1995). The principle is well explained in *Randolph v. Fireman's Fund Ins. Co.*, 124 N.W.2d 528 (Iowa 1963):

> Whether the defendant paid it by oversight, or because it was so small it did not care to provoke a controversy, or to promote public relations, or because of any other reason does not clearly appear. In

-19-

any event, the governing rule is clear . . . 'The rule is well established that the doctrine of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded there from . . . .' The rule seems to be of general, in fact universal, application.

*Id.* at 531-32; see Hammermeister v. Riverside Ins. Co., 323 N.W.2d 480, 482 (Mich. App. Ct. 1992) (insurer may rationally conclude it is better to pay something on a suspect claim than litigate the matter in the hope of paying nothing, yet it has no liability where the insured files suit). In addition, the evidence in the record shows Atlantic repeatedly reserved its rights to assert all policy provisions related to the Lotzs' claims.

Atlantic Mutual asserts several exclusions preclude coverage for the mold and rot damage. However, it must be noted at the outset that Atlantic expressly agreed to pay for mold resulting from a covered water loss regardless of whether the language in the policy excluded coverage or not. It appears from Atlantic's briefs that it believes the language in the policy actually excludes coverage for mold resulting from a covered water loss, but it adheres to an internal policy under which it pays for mold resulting from a covered cause of loss. The court will not disturb this understanding between the parties in this regard.

-20-

With this background in mind, the court will now examine the several exclusions Atlantic relies upon. When the court construes exclusions in an insurance policy, it is duty bound to ascertain the parties' intentions as revealed by the policy language. *See Sch. Dist. of Shorewood v. Wausau Ins. Co.*, 488 N.W.2d 82, 88 (Wis. 1992). The language in the policy is to be given its common and ordinary meaning from the point of view of what a reasonable person in the position of the insured would have understood the words to mean. *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 351 N.W.2d 156, 163 (Wis. 1984). The court will resort to the dictionary to ascertain the plain and ordinary meaning of words. *Arnold v. Cincinnati Ins. Co.*, 688 N.W.2d 708, 715 (Wis. Ct. App. 2004) (stating "we are to give words in a policy their common and ordinary meaning [and] we may use a dictionary for that purpose"). In the event the effect of an exclusion is uncertain, the court strictly and narrowly construes the exclusion against the insurer. *Cardinal v. Leader Nat'l Ins. Co.*, 480 N.W.2d 1 (1992). If an exclusion precludes coverage, the inapplicability of another exclusion will not reinstate coverage. *Am. Girl*, 673 N.W.2d at 73. If an exclusion applies and has an exception, the court looks to see whether the exception reinstates coverage. *Id.* The exception will not create coverage if a separate exclusion applies or if the policy otherwise excludes it. *Id.*

-21-

The sub-floor in the master bathroom and part of the master bedroom was damaged by deterioration and contamination in the form of mold and rot, and the damage was directly caused by the mold and rot and three other potential contributing causes: (1) rain water infiltration from the round window or the window in the master bedroom; (2) leakage from the steam shower; or (3) leakage from the hyrdonic tubing. If the finder of fact concludes the mold in the sub-floor resulted from rain water infiltration, there is coverage for the loss because rain water infiltration is not excluded under the policy. Atlantic argues rain water is excluded under the water damage exclusion, which reads as follows:

> Water Damage. We won't pay for direct loss caused by any kind of surface or underground water. This includes floods, waves, spray (whether or not it is driven by wind), seepage, leakage or water pressure. We won't pay for ensuing loss either, unless the direct cause is fire, theft or explosion.

(Policy at 5 of 19.) This exclusion cannot bear the construction Atlantic urges. The word "surface water" is defined as "natural water that has not penetrated much below the surface of the ground." WEBSTER'S THIRD INT'L. at 2300. Clearly, water on the surface of a home does not fall within the ambit of this definition. But perhaps more to the point, the Wisconsin Court of Appeals has concluded rain water is not "surface water" within the meaning of a water damage exclusion very similar to this one. *See Arnold*, 688 N.W.2d at 719. For these

-22-

reasons, a loss caused by rain water is not excluded under the water damage exclusion.

If, however, the finder of fact were to conclude the mold damage to the sub-floor in the master bathroom and part of the master bedroom occurred for any other reason, coverage for the loss is excluded. Coverage for the rot is similarly excluded. There is no coverage for such mold and rot damage because damage directly caused by the mold and rot is excluded under the contamination and deterioration exclusions. The deterioration exclusion reads as follows:

> Deterioration. We won't pay for direct loss caused by deterioration or inherent vice. This includes wear and tear, marring, scratching, latent defect, rust, *mold, wet or dry rot*, and electrical or mechanical breakdown.

(Emphasis added). The word "deteriorate" is commonly and ordinarily defined as "to make inferior in quality or value," "gradual impairment," and "degenerate." WEBSTER'S THIRD INT'L. at 616. The word "gradual" is commonly and ordinarily defined to mean "arranged in grades or degrees" and "moving, changing or developing by fine, slight, or often imperceptible graduations or modulations." WEBSTERS THIRD INT'L. at 985. The word "degenerate" is commonly and ordinarily defined to mean "having deteriorated progressively" and "to descend to a markedly worse condition in kind or degree." WEBSTER'S THIRD INT'L. at 593.

Thus, mold and rot cause deterioration when they impair the degree of quality or value of property as part of a gradual and progressive process.

The Lotzs disagree and contend the deterioration exclusion only excludes rot and mold when they occur as a result of a non-fortuitous event. But this construction is unreasonably narrow. Property can deteriorate from mold and rot in the plain and ordinary sense or the word regardless of whether they develop as part of a fortuitous event. Moreover, the language in the exclusion makes no distinction on the basis of fortuity. *See Cooper v. Am. Family Mut. Ins.*, 184 F. Supp. 2d 960, 963 (D. Ariz. 2002) (rejecting distinction between fortuitous and non-fortuitous causes of mold in similar exclusion).

The contamination clause also clearly excludes losses from mold or rot, and it reads as follows:

> Contamination. We won't pay for direct or ensuing loss caused by the release, discharge, dispersal or application of contaminants or pollutants from any source, or by rust, mold or wet or dry rot.

(Policy at 5 of 19.) "Contaminate" means "to render unfit for use by the introduction of unwholesome or undesirable elements." WEBSTER'S THIRD INT'L at 491. The Wisconsin Court of Appeals has given the word a similar construction: "a condition of impairment or impurity which results from . . . contact with a foreign substance." *Richland Valley Prods., Inc. v. St. Paul Fire &*

-24-

*Cas. Co.*, 548 N.W.2d 127, 131 (Wis. Ct. App. 1996). The exclusion provides contamination is caused by *either* (1) the release, discharge, dispersal or application of contaminants or pollutants from any source, *or* (2) rust, mold or wet or dry rot. Therefore, a "direct or ensuing loss caused . . . by rust, mold or wet or dry rot" is excluded.

The Lotzs disagree and contend contamination is caused by mold or rot only when it is released, discharged, or dispersed, but the exclusion cannot bear this construction. The exclusion plainly provides a contamination loss is caused by two *separate* things, which is made clear by the double use of the word "by" and the inclusion of the word "or." This grammatical structure readily informs a reasonable person that a contamination loss is caused "*by* the release, discharge, dispersal or application of contaminants or pollutants from any source, *or by* rust, mold or wet or dry rot." It is worth mentioning the Lotzs' proposed construction also leads to an odd result: after all, rust and wet and dry rot do not ordinarily release, discharge, or disperse.

The Lotzs argue even if the deterioration and contamination exclusions exclude coverage for losses caused by mold and rot, the exclusions do not exclude coverage for losses in the form of mold or rot. The Lotzs fashion this argument after the holding by the Arizona Court of Appeals in *Liristis v. American Family*

-25-

*Mutual Insurance Co.*, 61 P.3d 22 (Ariz. Ct. App. 2002). In *Liristis*, the court of appeals held there was a "distinction between mold which [was] the loss . . . from a covered event compared to loss what [was] caused by mold," based on the following language: "[there is no coverage for] loss to the property . . . resulting directly or indirectly from or caused by one or more of the following . . . smog, rust, corrosion, frost, condensation, *mold*, wet or dry rot." *Id.* at 24. The court of appeals explained its rationale:

> This language does not exclude all mold. Rather, it excludes loss 'resulting directly or indirectly from or caused by' mold. If American Family had intended to exclude not only losses caused by mold but also mold itself, it could have easily expressed that intention . . . . If American Family had added the words 'either consisting of, or . . .' to its exclusionary language, the loss 'consisting of' mold as well as loss caused by mold would be subject to this restrictive language.

61 P.3d at 26.

The court cannot adopt this reasoning because it is obliged to give the language in the policy its common and ordinary meaning, that is, what a reasonable person in the position of the insured would understand it to mean. *Am. Girl*, 673 N.W.2d at 73. No reasonable insured could read the deterioration and contamination exclusions and understand them to exclude coverage for a loss directly caused by mold and rot but *only* if the loss is not in the form of mold or rot. It is self-evident that if there is a loss in the form of mold or rot, then the loss

-26-

itself can be directly caused by mold or rot, and there is no reason for Atlantic Mutual to add language to its policy to make this any clearer: the meaning is obvious.  For these reasons, the court holds the deterioration and contamination exclusions exclude coverage for mold and rot.

To the extent water leaking from the steam shower contributed to the development of the mold and rot in the sub-floor by creating an environment for the mold and rot to develop, coverage for the loss is already excluded by the deterioration and contamination exclusions, and under the contributing cause provision, which provides the exclusions in the policy "apply regardless of any other cause or event contributing concurrently or in any sequence to the loss," (Policy at 5 of 19), coverage for the mold and rot damage is excluded under the deterioration and contamination exclusions regardless of the other causes which contributed to their development.  *See Cooper*, 184 F. Supp. 2d at 962 (construing similar contributing clause provision to mean there "is no coverage for losses caused by mold, even though a covered . . . event may have also contributed to the loss").  The Lotzs contend the court should ignore the contributing cause provision because it is against Wisconsin public policy.  However, the Lotzs do not cite Wisconsin authority stating so, and therefore the court is in no position

-27-

"to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Girl*, 673 N.W.2d at 73.

In any event, to the extent leaking from the steam shower contributed to mold and rot damage, coverage for the loss is separately excluded under the defective construction and leakage and seepage exclusions. The defective construction exclusion reads as follows:

> Faulty, Inadequate, or Defective. We won't pay for direct loss caused by defect, weakness, inadequacy, fault or unsoundness in:
>
> - planning, zoning, development, surveying, siting;
> - design, specification, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> - materials used in repair, construction, renovation, remodeling or maintenance;
> - maintenance
>
> of any property such as land, structures or improvements of any kind, whether on or off a residence named on the Coverage Page.
>
> We won't pay for ensuing loss either, unless the direct cause is a risk not excluded in (1) to (22) above.

(Policy at 5 of 19.) The last sentence of the defective construction exclusion states if an "ensuing loss" is caused by defective construction, coverage for the loss is excluded unless coverage for the direct cause for the loss is *not* excluded under paragraphs (1) through (22). The term "ensuing loss" is defined as "a property loss caused indirectly by a particular set of circumstances." (Policy at 17 of 19.)

-28-

In *Arnold v. Cincinnati Insurance Company*, 688 N.W.2d 708 (Wis. Ct. App. 2004), the Wisconsin Court of Appeals construed the term as follows:

> A reasonable insured would understand that an ensuing loss is not simply any loss to covered property that chronologically follows a loss . . . Thus, a reasonable insured would understand . . . that the meaning of 'ensuing' here is a loss that follows the excluded loss 'as a chance, likely, or necessary consequence' of that excluded loss.

*Id.* at 716. The court of appeals also construed the term "ensuing loss" in the context of a defective construction exclusion similar to the one in this case:

> [A]n ensuing loss is a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a 'chance, likely, or necessary consequence' of the loss caused by faulty workmanship or faulty materials.

*Id.*

Here, the evidence shows the shower leaked because it was defectively constructed, and the development of mold and rot in the sub-floor was a "likely" or "necessary consequence" of the defects. As such, the mold and rot were ensuing losses caused by the defective construction, and coverage for this ensuing loss is excluded under the defective construction exclusion because the direct cause for the damage to the sub-floor, *i.e.*, mold and rot, is excluded under (5) and (6).

-29-

To the extent leaking from the steam shower contributed to the damage to the sub-floor, coverage for that contributing cause is also separately excluded under the leakage and seepage exclusion, which reads as follows:

> You may have a loss caused by certain home appliances breaking down, or not working right. The following rules apply to property loss caused by any of these appliances: heaters, air conditioners, *plumbing fixtures*, or other household appliances.
>
> (1) Leakage and seepage. We won't pay for loss to a *residence* caused by water or steam escaping from one of these appliances or fixtures over a period of time. It doesn't matter whether it escaped continuously or in repeated *occurrences*.
>
> (2) Sudden water loss. We will pay for loss to a *residence* or *personal property* caused by water escaping from one of these appliances suddenly and accidentally. Even if the escape was due to deterioration, contamination, air pollution, building movement or animals. We'll also pay to tear out and replace any part of a building necessary to repair the appliance. But we won't pay for the loss to the appliance itself.

(Policy at 6 of 19.) The evidence in the record plainly shows the water that leaked from the steam shower and caused the mold and rot did not result from a "sudden" and "accidental" release; rather, the water leaked and caused damage "over a period of time."

Finally, to the extent leaking from the hydronic tubing contributed to the damage to the sub-floor, coverage is excluded under the leakage and seepage exclusion. No reasonable finder of fact could conclude the hyrdonic tubing leaked

-30-

"suddenly"; rather, the only permissible inference under the circumstances is that it leaked over "a period of time."

The walls in the master bathroom were damaged by contamination and deterioration in the form of mold and rot as well as two other potential contributing causes: (1) water infiltration from the round window in the master bedroom, and (2) leaking from the steam shower. For the reasons already discussed, there is coverage for the mold damage if the finder of fact determines the mold resulted from rain water infiltration. If the finder of fact determines the mold occurred for any other reason, coverage is excluded. In addition, coverage for any rot damage is excluded for the reasons already discussed.

The kitchen ceiling was damaged due to contamination and deterioration in the form of mold and rot as well as four other possible contributing causes: (1) rain water infiltration from the round window in the master bedroom or from the intersection of the eating area roof and the east wall of the main bath; (2) leaking from the steam shower, (3) leaking from the toilet flange/seal; (4) leaking from the hydronic tubing in the master bedroom and bathroom. As already discussed, if the finder of fact determines the mold damage in the kitchen ceiling resulted from rain water infiltration, the loss in the form of mold is covered. However, coverage for the mold and rot in the ceiling is excluded if the

-31-

finder of fact determines the damage occurred for any other reason. The court has already explained its rationale for why coverage for the leaking from the steam shower and hyrdonic tubing is excluded, and coverage for the leaking toilet flange and shower in the main bath is excluded under the leakage and seepage exclusion. The only permissible inference from the evidence in the record is that the leak from the toilet and shower that contributed to the damage occurred "over a period of time."

The walls and floor in the main bath were damaged due to contamination and deterioration in the form of mold and rot. In addition to the mold and rot there were three other potential contributing causes: (1) rain water infiltration from the round window in the master bedroom or from the intersection of the eating area roof and the east wall of the main bath; (2) leaking from the steam shower; (3) leaking from the toilet and shower in the main bath. As already discussed, there is coverage for the mold damage if the finder of fact determines the mold resulted from rain water infiltration, but if the finder of fact determines the mold occurred for any other reason, coverage is excluded. In addition, coverage for the rot damage is excluded for the reasons already discussed.

The walls and floor in the family room also were damaged due to contamination and deterioration from mold and rot as well as three potential

-32-

concurrent causes: (1) rain water infiltration (a) through the family room windows, (b) at the intersection of the roof and the wall of the northwest corner, (c) at the roof flashing above the main entry, or (d) through the stone veneer at the east, south, and west elevations; and (2) surface water infiltration. As already discussed, if the finder of fact determines the mold damage resulted from infiltration of rain water, there is coverage for the mold. However, there is no coverage for the mold if the finder of fact determines it occurred for any other reason, and there is no coverage for rot damage either, because damage directly caused by mold and rot are excluded under the deterioration and contamination exclusions. Consistent with the contributing causes provision, coverage for contributing causes is excluded as well.

Moreover, to the extent surface water infiltration contributed to the loss, coverage is excluded under the defective construction and water damage exclusions. The evidence in the record plainly shows defects in the construction of the 1991 addition permitted surface water to seep into the base of the family room walls. Although mold and rot were not certain to result from these defects, they were likely or necessary consequences of these defects. As such, the mold and rot were ensuing losses caused by defective construction. Because coverage for the direct cause of the loss, *i.e.*, mold and rot, are excluded under (5) and (6),

-33-

coverage for this ensuing loss is excluded.  Finally, the water seeping into the base of the family room windows clearly constitutes surface water within the meaning of the water damage exclusion, and thus, coverage for the mold and rot damage which indirectly resulted is excluded.

The wall immediately adjacent to the front entry was damaged due to deterioration from rot, and the damage was directly caused by the rot as well as one other potential contributing cause: infiltration of rain water.  As already discussed, coverage for the loss is excluded under the contamination and deterioration exclusions.  In addition, to the extent the infiltration of rain water contributed to the loss, coverage is excluded under the contributing cause provision.

The wall framing and OSB sheathing at the northwest corner of the family room was damaged due to deterioration from rot, and the damage was directly caused by the rot as well as one other potential contributing cause: infiltration of rain water.  Coverage for the loss is excluded under the contamination and deterioration exclusions.  In addition, to the extent the infiltration of rain water contributed to the loss, coverage is excluded under the contributing cause provision.

-34-

The wall of the northeast corner of the family room was damaged due to contamination and deterioration from mold and rot, and the damage was directly caused by the mold and rot as well as one other potential contributing cause: infiltration of rain water. There is coverage if the mold resulted from the rain water, but not otherwise.

The attic was damaged due to contamination from mold, and the damage was directly caused by the mold as well as one other potential contributing cause: excessive moisture from the clothes dryer and bathroom exhausts venting to the attic. Here coverage for the loss is excluded under the contamination and deterioration exclusions. In addition, to the extent defective construction contributed to the loss, coverage for the loss is excluded under the contributing cause provision as well as the defective construction exclusion.

Finally, the home was demolished due to the enforcement of a raze order issued by the Village of Whitefish Bay, and the direct cause of the demolition was the enforcement of the order as well as one other contributing cause: the mold damage. Coverage for the loss is excluded under the government action exclusion, which reads as follows:

> Government action: We won't pay for *direct* or *ensuing loss* caused by the enforcement of any ordinance or law regulating construction, repair or demolition unless specifically provided under the policy.

-35-

(Policy at 5 of 19.)

Here, the demolition of the Lotzs' home was directly caused by the enforcement of a nuisance ordinance by the Village of Whitefish Bay, and the nuisance ordinance regulated the construction, repair, and demolition of the Lotzs' home. As such, coverage for the demolition is excluded. In addition, to the extent the mold was a contributing cause for the demolition, coverage is excluded under the contributing cause provision as well as the contamination provision. The demolition was not certain to result from the mold contamination, but it was a likely or necessary consequence of the mold contamination. As such, the demolition was an ensuing loss caused by the mold contamination, and coverage for an ensuing loss caused by mold contamination is excluded under the contamination exclusion.

In light of the foregoing, the court is obliged to conclude there are several triable issues concerning whether there is coverage for the mold damage to the home, and to that extent Atlantic Mutual's motion for summary judgment must be denied.

Finally, pending resolution of the coverage issues reserved for trial, the court will withhold judgment as to the merits of the Lotzs' claims for breach of contract,

-36-

breach of implied covenant, and bad faith damages.  *Cf. Richland Valley*, 548 N.W.2d at 134.[2]

Accordingly,

IT IS ORDERED that consistent with the terms of this order, Atlantic Mutual's motion for summary judgment (Docket #109) be and the same is hereby GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that the Lotzs' motion for partial summary judgment (Docket # 107) be and the same is hereby GRANTED in that the court finds the Lotzs' losses were a covered occurrence within the meaning of the policy;

IT IS FURTHER ORDERED that Atlantic Mutual's motions to strike (Docket ##124, 127, 129, 136) be and the same are hereby DENIED;

IT IS FURTHER ORDERED that the Lotzs' motion to strike (Docket # 143) be and the same is hereby DENIED; and

---

[2] The court has reviewed the five motions to strike filed by the parties (four by Atlantic Mutual and one by the Lotzs), and the court finds they lack merit and otherwise have no bearing on its decision in this case.  As such, they will be denied.

IT IS FURTHER ORDERED that the Lotzs' motion for a hearing (Docket # 147) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this __24th__ day of August, 2005.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge